615 So.2d 1166 (1992)
Dr. Vernon D. GIFFORD and Mrs. Jean Gifford
v.
FOUR-COUNTY ELECTRIC POWER ASSOCIATION.
No. 89-CA-0583.
Supreme Court of Mississippi.
December 17, 1992.
Rehearing Denied April 22, 1993.
*1168 William Liston, Liston/Lancaster, Winona, for appellant.
David L. Sanders, Mitchell McNutt Threadgill Smith & Sams, Columbus, for appellee.
Before DAN M. LEE, P.J., and PITTMAN and BANKS, JJ.
BANKS, Justice, for the Court:
Dr. Vernon Gifford sustained severe injuries when he came in contact with a live power line which had fallen from one of the utility poles installed by Four-County Electric Power Association (association). Dr. Gifford and his wife, Jean Gifford (Giffords or plaintiffs) brought a complaint in negligence against the association. The jury found for the association. From the judgment issued in conformity with the verdict, the Giffords prosecute this appeal. Finding that the court erred in failing to properly instruct the jury regarding defendant's negligence in failing to inspect the pole, we reverse and remand for a new trial.

I
On January 29, 1988, the Giffords filed a complaint in the Oktibbeha County Circuit Court alleging that Four-County Electric Power Association's negligence resulted in severe injury to Dr. Gifford. Specifically, the Giffords claimed that early on the morning of November 16, Dr. Gifford was "severely and painfully burned about his chest, abdomen, groin, and both legs when he came into contact with defendant's high-voltage power line, which had fallen because two utility poles supporting it had themselves broken and collapsed to the ground." They averred that the poles were decayed, rotten, termite-infested and were no longer suitable for their intended purpose. Furthermore, they complained that association's failure to inspect, replace, or install two new poles evidenced carelessness and a lack of due care. Damages were sought in the aggregate amount of $1,600,000.
The association answered and denied all material allegations listed in the complaint. Additionally, it averred that the accident was extraordinary, improbable, and could not have been reasonably foreseen; that Dr. Gifford was contributorily negligent in that he failed to exercise ordinary care or, alternatively, he assumed the risk of injury.
The jury, after hearing all of the evidence, returned a verdict in favor of the defendant. The Giffords filed the usual post-trial motions which were overruled by the court. Aggrieved, the Giffords filed a timely appeal on May 11, 1989.

II
The plaintiffs began their case by calling Dr. Gifford, who testified to the following. Before 6:00 a.m. on November 16, 1987, while it was still dark, Vernon Darryl Gifford was awakened by the honking of a car horn in front of his house. The man driving the car hollered to Dr. Gifford that there was a fire near his barn and that he "should probably check on." Dr. Gifford immediately ran back to his bedroom, dressed, asked his wife to call the Pheba Volunteer Fire Department, and awakened *1169 his nineteen-year-old son, Shandon Darryl Gifford.
Dr. Gifford took a large fire extinguisher from the kitchen in his home, and ran out the front door to fight the fire. After getting to the barn and experiencing little success, he decided to return to his house to obtain some two-gallon garden sprayers. He began running toward the highway, where he had parked his truck, only to collide with Four-County Electric Power Association's downed power lines within a distance of approximately twenty or twenty-five feet from where he had started running. Lying on his back and looking into the sky, Dr. Gifford saw at least one of the power lines approximately 2 1/2 feet above his chest.
Dr. Gifford, who was dragged from the line by his son and taken to the hospital by neighbors, suffered extensive burns for which he was treated for twenty-eight days in the Burn Center in Greenville.
The testimony revealed that the downed power transmission line was designed for single-phase 7200 volts phase to neutral. The wooden utility pole which had fallen earlier that night had been installed in this line in 1961 or 1962. Eight months before the accident in November, Dr. Gifford called the association and reported a defective pole that was located on his property.
Dr. Duane Lyon, a professor of wood science and technology at Mississippi State University and a scientist with the Mississippi Forest Products Utilization Lab, was tendered and accepted, without objection, as an expert in the field of wood engineering. He had occasion to examine the two poles located on the Gifford property which fell on November 16, 1988.[1]
The examination consisted first of a  a visual inspection. This was followed by a careful inspection of the pole to assess any naturally occurring characteristics or defects in the pole, and I was comparing to a standard, and I'll get into the standard in a little while, and then I took measurements with a tape measure to determine the size of the pole circumference at various locations, the length of the pole, and this was followed then by a careful examination of the fracture surface at the point where the  the pole had failed and at that point I also took some samples from the pole.
He found evidence of termite infestation in pole number one. However, in pole number two, he attributed deterioration primarily to brown rot decay fungi. The witness explained that this fungus has a devastating effect on the strength properties of wood. He testified that visually, there appears to be nothing wrong with the wood. "It looks normal, and yet at this point, uh, the bending strength of the wood might be as reduced by as much as seventy percent... . Now what I observed in pole number two was that the interior of the pole was in the advanced stages of decay." He stated that everything except the outer three-fourth inches had essentially no strength left at all because of the advanced stages of decay. He concluded that the pole in question had deteriorated fifty-percent and exceeded the level of deterioration allowed by the National Electrical Safety Code (Code).
Dr. Lyons testified that the code calls for replacing a pole when it has deteriorated by twenty-five percent; the pole in issue had deteriorated by fifty percent, that is, the strength of the pole had been reduced by half. He stated that there were techniques by which the company could have tested the wood for compliance with the applicable rules of the code and normal poles should be able to withstand winds of 15 to 20 miles per hour.
Dr. Lyons opined that poles should be inspected on eight-to-nine-year cycles. On cross examination he agreed that he copied and relied upon sections from the code of 1961 which had been abrogated and had not been in effect since 1977. Additionally, Dr. Lyons was not aware that the bureau that released the standards on which he relied, had in 1972, asked to be relieved of its duties in setting standards in the electrical industry. He admitted that he did not *1170 examine the 1984 electrical safety code, the applicable code at the time of the accident, in conducting his examinations/studies in this case. He explained that he relied upon the older standards because they were applicable when the pole was installed.
Dr. Lyon stated if the pole had been inspected some time before November 16, it would have been declared as a "pole in trouble and it would have been replaced." He inspected another pole, number one, and it contained extensive decay to the same degree as pole number two; in addition, pole number one had an infestation of subterranean termites. Pole number one also fell on the same date as number two. Dr. Lyon opined that both poles should have been replaced by the association.
To present its theory, the defense called James Forrester, manager of systems operations at Four-County to testify. Forrester explained that Four-County was an electric power association that was member-owned; each person receiving power from the association is an owner. He testified that servicemen visually inspect poles, as they go from place to place. Linemen are also trained to sound a pole before climbing it. In 1983, the association conducted an operation and maintenance survey. In accordance with the survey, it chose six one-mile segments in each district and did a complete survey from pole to pole. In conducting the test, the association picked from lines that were between 10 to 20 years old to be sure there was a representative sample in determining what shape lines were in. The association contracted with a company to inspect and chemically treat poles, if necessary. Thirteen thousand poles were inspected. In the area where the Giffords lived, there were 220 poles on the line. Prior to the accident, 199 of those poles had been inspected. He stated that because one pole is decayed does not mean that others on the same line or in the same area are decayed.
On cross-examination, Forrester testified that he had no records showing that the pole in issue had ever been inspected. He admitted under the guidelines followed the pole should have been inspected within its twenty-seven-year lifetime.
The defense expert, James Abernathy (Abernathy) stated that the code applicable during the time of the accident was the 1984 code. The crux of his testimony was that even if the pole in issue lost fifty percent of its strength, as testified to by Dr. Lyons, it more than met the requirements of the Code. "It is triple the requirements of the National Electrical Safety Code." He concluded that pole number two exceeded by two-and-one-half-to-three times the strength requirements of the code, on the date of the accident. He testified that when the pole was installed, it exceeded standards by a sufficient margin that it could lose eighty-three percent of its strength and still meet and comply with the code requirements. He stated that the best probability as to what happened to the pole is that during the night a high wind cracked the pole and later a lighter wind caused it to break.
On cross-examination, Abernathy stated that he could not disagree with Dr. Lyon's statement that the pole in question had lost fifty percent of its strength. Also, he agreed that an inspection cycle of twenty-eight years would be too long. He assented to counsel's statement that the pole should have been able to withstand wind velocities of twenty-five miles per hour.
Herbert Handley, professor of statistics at Mississippi State, testified that, if in doing a sample, one discovered poles that had damage or other problems, then that would infer that one needed to look at the total population of all poles that had those characteristics. On cross-examination, he testified that he did not know how the association chose its samples and did not know any of the facts about how the association inspected poles. He admitted that 13,000 poles, with a pole-by-pole sampling of the oldest poles would be a representative sample.
Before trial the court had considered a motion in limine. Plaintiffs' counsel stated that because he was served with the defendant's motion immediately before the trial began, he was unable to respond adequately. *1171 Defense counsel asked that the court exclude any testimony by the plaintiff regarding other poles that had been replaced in January of 1986. It was the defense position that since the accident in question happened in November of 1987 and the poles were replaced in 1986, any probative value was negligible and not proper evidence to be considered by the jury. Plaintiff's counsel responded that all the poles which had been replaced were within a half to three-fourths of a mile of the pole in issue; the older poles were all defective in some way and these defects should have placed the association on notice to check poles that were close to the pole in issue because of similar age and the fact that they shared the same line. The court granted the motion in limine.

III
This Court will not reverse a jury verdict unless it is against the overwhelming weight of the evidence and credible testimony. Marcum v. Mississippi Valley Gas, 587 So.2d 223 (Miss. 1991); Roberts v. State Farm Mut. Auto. Ins. Co., 567 So.2d 1193 (Miss. 1990). Here, in the face of conflicting testimony of expert witnesses, the jury rendered its verdict in favor of the defense. On the facts and evidence in the record, such decision was not contrary to the greater weight of the evidence.

1.
The Giffords posit as their first contention the trial court's grant of the defense motion in limine which sought to exclude any testimony concerning other utility poles in the same power line/in close proximity to the poles which collapsed within two years of the accident in question. They argue that the court's ruling prevented them from mentioning the two poles that collapsed and that other poles of similar age and quality had been replaced by the association because they were rotten. It was their position that because of these incidents the association was on notice to inspect the pole in question.
The association responds that this issue is without merit. First, it argues that the Giffords failed to preserve this assignment by not making a proffer of the testimony they proposed to elicit concerning the two poles. Second, it answers that any testimony concerning the two poles was not relevant.
This Court delineated and discussed the standard to be applied with relation to motions in limine in Whittley v. City of Meridian, 530 So.2d 1341 (Miss. 1988).[2] There, the Court adopted a test espoused by the Kansas Supreme Court which held that motions in limine should be granted only when the trial court finds that two factors are present: "(1) the material or evidence in question will be inadmissible at a trial under the rules of evidence; and (2) the mere offer, reference, or statements made during trial concerning the material will tend to prejudice the jury." The primary *1172 purpose of such motions is to exclude evidence highly prejudicial to the movant.
Here the trial court clearly made a preliminary ruling only and explicitly reserving the right to revisit the issue should the evidence develop in a manner in which the court could conclude that the prior pole incidents were relevant. The Giffords did not pursue the matter thereafter to the point of asking the court for a final ruling. No proffer was made of the testimony claimed to have been excluded and it is also clear that some testimony concerning prior pole failures was introduced. Under the circumstances this claim of error is without merit.

2.
The Giffords contend that the court erred when it refused to grant instructions P-8 and P-9. P-8 provided,
The Court instructs the jury that if you find from a preponderance of the evidence that the Defendant, Four-County Electric Power Association, violated the standard provided by Section 214 of the National Electrical Safety Code by never once inspecting the wooden electric utility pole which broke on the night of November 15-16, 1987, then the Defendant, Four-County Electric Power Association, is guilty of negligence per se, and if you believe from a preponderance of the evidence that such negligence was the proximate cause or a proximate contributing cause of the injuries to Plaintiffs, Dr. Vernon D. Gifford and Mrs. Jean Gifford, then you should return a verdict for the Plaintiffs.
P-9 provided,
The Court instructs the jury that if you find from a preponderance of the evidence that the wooden utility pole which broke on the night of November 15-16, 1987, had an overload capacity of less than 1.33 when it did break so that the Defendant, Four-County Electric Power Association, did then violate the standard provided by Section 261 A2d of the National Electrical Safety Code which requires that such a wooden utility pole be replaced when its overload capacity becomes less than 1.33, then the Defendant, Four-County Electric Power Association, is guilty of negligence per se, and if you believe from a preponderance of the evidence that such negligence was the proximate cause or a proximate contributing cause of the injuries to Plaintiffs, Dr. Vernon Gifford and Mrs. Jean Gifford, then you should return a verdict for the Plaintiffs.
The association responds that the instructions were properly refused because they were neither proper statements of the law nor supported by evidence produced at trial. We disagree with respect to P-8.
It was estimated that the poles in issue were probably set in 1961. Dr. Lyon and Mr. Abernathy both stated that an eight-to-ten year cycle was optimal for pole inspection purposes in accordance with industry standards. The testimony of the association employees was that the pole should have been inspected at some point during its service life, that there was no record evidencing an inspection, and that had there been an inspection, there should have been a record of it. Failure to inspect constitutes failure to comply with applicable safety standards and is negligence per se. There was testimony that a proper inspection would have revealed the defect in the pole. The instruction should have been given and the failure to do so is reversible error.
As to P-9, the jury was presented with conflicting testimony from the experts. Both experts agreed that the pole had lost half of its strength. Dr. Lyon, testifying on behalf of the plaintiffs, stated that the weakened condition of the pole violated the standard required by the code which provided that once a pole overload capacity becomes less than 1.33, then the utility is guilty of negligence per se. As stated by the association, no one, including Dr. Lyon, testified concerning this number. Rather, he stated that the pole lost fifty percent of its strength. Moreover, Mr. Abernathy took Dr. Lyon's testimony into account in his calculations and he determined that even in its weakened state, the *1173 pole still exceeded by two and one-half to three times the strength requirements of the code. Thus, there was no evidence before the jury upon which it could reasonably conclude that the pole had a strength less than that specified in the code.
The Giffords contend that instruction P-9 was modelled after an instruction approved by the Court in Galloway v. Singing River Electric Power Association, Inc., 247 Miss. 308, 152 So.2d 710 (1963). They state that "[t]here can be no doubt that Galloway v. Singing River Electric Power Association, Inc., supra, recognized that the National Electric Safety Code established minimum standards for the construction and maintenance of electric power lines, the violation of which would constitute negligence per se." While that is true it remains the plaintiffs duty to adduce evidence of non-compliance sufficient for reasonable jurors to conclude that the applicable code has been violated. That evidence was not adduced here. There is simply nothing in the record which would warrant that this Court find error in the refusal of the lower court to give instruction P-9.
Instruction P-1A properly instructed the jury as to the standard of care owed to the Giffords by the association and told it that, if the pole was decayed and rotten to the point that it could not support the lines in question, and if the association "could have inspected and thereby discovered" the defect and failed to proximately cause the accident, then it could find for the plaintiff. The court committed no error requiring reversal by refusing to grant P-9. In Mississippi State Highway Commission v. Spencer, 209 So.2d 821, 824-25 (Miss. 1968), it was held that a court need not grant duplicative instructions simply to satisfy each parties desire for emphasis.

CONCLUSION
Because the court failed to instruct the jury that the failure, if any, to have inspected the pole in question at any time during its service life was negligence per se and because we are uncertain what effect if any, the absence of this instruction had upon the jury's deliberations we reverse and remand for new trial.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, PITTMAN and McRAE, JJ., concur.
ROBERTS, J., not participating according to Supreme Court Internal Rules.
NOTES
[1] He distinguished between the poles by designating them as poles number one and two. Pole number two had burn marks and was the pole which fell on Dr. Gifford.
[2] Plaintiffs argue that the Whittley decision is similar to their case. In Whittley, the City of Meridian had received a letter and a federal publication from the Consumer Product Safety Commission of which the city engineer was aware, concerning the potential dangers of refuse bins similar to the one in the case before the Court. Anticipating that Whittley would introduce evidence relating to the letter to show that Meridian had notice of the instability of the bin, the city made a motion in limine to exclude the evidence; the motion was granted by the trial court. During the proffer, Whittley called the city engineer, who admitted having received the letter and publication, wherein it was brought to the city's attention that the bins were hazardous. In the presence of the jury the engineer denied having received the letter.

On appeal, this Court reversed the trial court. It found that the letter was admissible under the rules of evidence and the exclusion of the evidence allowed the defense to project a false premise to the jury because the engineer denied having notice of any danger stemming from the use of the refuse bin in question. We held, also, that the result of the trial court's refusal was that the jury was allowed to believe that there had never been any notice given regarding the stability of the refuse bins where, in fact, there had been twenty-four deaths. Here, the record is bereft of any testimony concerning similarity of poles with reference to age, land conditions, or otherwise. Furthermore, evidence that other poles, in close proximity to the Gifford property had to be replaced was before the jury. The court committed no error in excluding the testimony.