# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 96-CA-00926-SCT

*MISSISSIPPI TRANSPORTATION COMMISSION*

*v.*

*DUDLEY B. BRIDGFORTH, JR., DAVID R. BRIDGFORTH, BARRY W. BRIDGFORTH, MARGARET BRIDGFORTH KING SANFORD, BETTYE B. WHITTEN JENKINS, DAVID ARTHUR WHITTEN, BETTYE B. WHITTEN FUNDERBURK, ANDREA CAROL WHITTEN WILLIFORD, MARTHA FRANCES TARVER, MARY LULA DEAN FISHER, WILSON BYRD TARVER, JR., CONNIE COCHRAN CARTER, AND BESSIE LEONA FISHER CHISUM*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/13/96 |
| TRIAL JUDGE: | HON. JOSEPH C. WEBSTER |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY SPECIAL COURT OF EMINENT DOMAIN |
| ATTORNEYS FOR APPELLANT: | MICHAEL T. LEWIS |
| | PAULINE SHULER LEWIS |
| ATTORNEYS FOR APPELLEES: | TAYLOR D. BUNTIN, III |
| | BARRY W. BRIDGFORTH, JR. |
| NATURE OF THE CASE: | CIVIL - EMINENT DOMAIN |
| DISPOSITION: | AFFIRMED - 04/02/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/23/98 |

**BEFORE PITTMAN, P.J., McRAE AND ROBERTS, JJ.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. This eminent domain case arises from a jury decision of a Special Court of Eminent Domain in Tunica County [(1)] finding that the landowners, members of the Bridgforth family, were entitled to just compensation of $267,919 from the Transportation Commission for some 4.32 acres of land taken for the widening of Goodman Road in DeSoto County. The Commission appeals the amount of the jury award as well as the propriety of the Special Court's order granting the landowner's motion in limine to keep from the jury evidence of grave sites discovered nearly a year after the Commission

took title to the property. Finding that the Special Court did not err in granting the motion in limine or in admitting the testimony of the landowner's expert appraiser and that there is substantial evidence in the record to support the jury's verdict, we affirm the award of compensation.

I.

¶2. On September 8, 1993, the Mississippi Transportation Commission filed a petition in DeSoto County for the organization of a Special Court of Eminent Domain to consider condemnation of the Bridgforth property. The Commission's Motion for Order Granting Petitioner Immediate Title and Possession was granted on December 10, 1993. The independent appraisal of the property as of September 8, 1993, based on the value of the 4.32 acres taken, the "before" value of the total property, the "after" value of the total property, and any damages to the remaining property resulting from the partial taking, was $75,600.

¶3. On April 15, 1994, the landowners filed a Statement of Values, asserting that the fair market value of the condemned property, as of the date the complaint was filed, was $267,919. They claimed no damage to the remainder of property and sought compensation in the amount of $267,919.

¶4. On January 11, 1996, the landowners filed a motion in limine to keep from evidence any mention of the presence or possible presence on the property of any "grave sites, graves, caskets, and/or human remains." They maintained that there was no evidence to show that the presence or possible presence of grave sites on the property reasonably would have been known to a hypothetical buyer and seller at the time of the taking, and further, that no facts had been developed to indicate that such knowledge would affect the fair market value of the property. In its February 21, 1996 response, the Commission asserted that the motion in limine should be denied, arguing that the existence of a cemetery in the area was common knowledge and would have been discovered by a reasonable buyer and seller. The Commission further contended that the presence of grave sites affected the fair market value of the property and that the probative value of the evidence of such grave sites outweighed any possible prejudice. Finding that there was no evidence that either party had any knowledge that there were any grave sites on the property at the "time of the taking," the Special Judge granted the motion in limine.

¶5. On June 11, 1996, a jury of the Special Court of Eminent Domain in Tunica County found that the landowners were entitled to compensation of $267,919 for the taking of the subject property. The Commission filed its motion for j.n.o.v. and alternate relief on June 18, 1996, asserting that the Special Court erred in excluding evidence of existence of a cemetery on the property and that the landowners' expert improperly valued the property. The Special Court overruled the motion in an August 1, 1996 order.

II.

¶6. The Bridgforth property is a 4.32 acre tract of land at the intersection of Goodman and Pleasant Hill Roads near Olive Branch in DeSoto County. It is located in a rapidly developing area near Highways 61 and 78 and was acquired by the Commission on September 8, 1993, for the expansion of Goodman Road from two to five lanes. The land at issue is part of a larger tract, comprising some 37.25 acres of farm land, that has been in the Bridgforth family since the early 1900s. The plot involves some thirteen hundred feet of frontage, just short of a quarter of a mile, along Goodman

Road, and approximately one thousand feet of frontage along Pleasant Hill Road.

¶7. Because two adjacent churches and cemeteries were located near the site and there had been rumors of an "old slave or colored cemetery" on Pleasant Hill Road, the Commission's Environmental Section looked at the site prior to the letting of any contracts.[(2)] There were no tombstones or signs designating a cemetery on the site. The Commission received permission from the landowners to bush hog the area and found nothing. Metal detectors were used to look for coffin nails, but found nothing. Although no evidence of any graves or grave sites was found, William York, the Commission's spokesperson, stated in his deposition that the contractors were directed to work carefully and remove earth from the construction site in six to eight inch lifts.

¶8. On September 16, 1994, nearly a year after the "quick take" order was entered in December, 1993, construction workers found a coffin handle while working on the Goodman road right-of-way. Construction was halted and digging down to a level three feet below the natural ground level, five grave sites were found, at least two of which contained human remains. Further examination of the site was made with a ground radar penetrating device, revealing one more grave on Goodman Road and nine potential grave sites on Pleasant Hill Road. Working into the Spring of 1995, a total of eight grave sites were uncovered on the Goodman Road site by archaeologists from Memphis and the University of Alabama, after which the area was declared free of graves. Permission was obtained from chancery court to move the remains to the city cemetery in Hernando.

¶9. Laney Funderburk, whose wife's mother was a Bridgforth, grew up near the property and first heard rumors about a cemetery on the property after the condemnation proceedings began. He knew of no rumors about a cemetery surfacing back in the 1960s when Pleasant Hill Road was widened. David Bridgforth, another family member, who farmed several hundred acres of land around the site between 1990 and 1995, had never seen any evidence of graves or grave sites when quail hunting on the land where remains were found. He indicated in his deposition that he first heard rumors about a cemetery after the right-of-way proceedings began. Barry Bridgforth, Sr. likewise testified that he had no prior knowledge of any cemetery on the site. He noted, too, that elderly relatives, likewise, had no knowledge of any graves or grave sites.

¶10. In depositions taken in 1996, several area residents substantiated the rumors the parties had heard prior to and after the taking. They recalled an old cemetery on the Bridgforth property across from the schoolhouse once located on Pleasant Hill Road, on the St. Paul's Missionary Baptist Church and Cemetery property. All had attended the school between the late 1920s and early 1950s. Pleasant Hill Road, at that time, was a narrow two-lane gravel road, first widened around 1960. Goodman Road was a dirt road, barely wide enough for two cars to pass. Each remembered seeing some grave markers in the woods across from the school where, as small children, they had gathered brush wood for the school. One elderly man, however, stated that he was told there was a cemetery back where he and the other children gathered wood, but "Wasn't no tombstones there. I ain't never seen none. There wasn't nothing there, not then. I ain't never seed nothing, and went in there for years and never seed one."

¶11. When the landowners learned of the rumors, they hired a Memphis archeologist, Guy Weaver, to investigate. Weaver identified two areas, known as Locus 1 and Locus 2, as possible cemetery sites. Locus 1 was located on the crest of a ridge northeast of the intersection of Goodman and

Pleasant Hill Roads. It ran north to south, with the northern section located on the Bridgforth's remainder land and the southern section extending onto the right-of-way. Locus 2, on the next ridge west of Locus 1, adjacent to Pleasant Hill Road, was located entirely on the Bridgforth remainder property. Using a combination of probing and backhoe trenches, no positive indications of grave sites were found in Locus 1. In Locus 2, using the same methods, Weaver found sixteen grave sites, at which point the landowners requested that he concentrate on finding the boundaries of the cemetery. He ultimately found thirty-five suspected graves and estimated that there could be as many as 125 to 175 graves if the density of the entire site was the same as that of the area tested.

¶12. The Commission's appraiser, Lucy Griffin, used the comparable sales approach to arrive at her valuation of the property. She looked for sales of undeveloped tracts of land ranging from ten to thirty acres. Looking at three sales she believed to be comparable, and making adjustment for size, location and time of sale, Griffin arrived at a value of $19,000 per acre for the property. She therefore computed the "before" value of the 37.25 acre tract at $712,900. Reducing the size of the property by the 4.32 acres taken by the Commission to 33.2 acres, Griffin calculated the "after" value at $630,800. Subtracting the "after" value from the "before" value, Griffin determined that just compensation for the property taken was $82,100.[3] She further opined that there was no damage to the remainder property.

¶13. On cross-examination, it was brought out that only one of the three comparable sales utilized by Griffin in her computations was made within two years of the taking of the Bridgforth property. The others were between three and five years prior to the taking. Further, although Griffin assigned a figure of $19,000 per acre to the Bridgforth property, the three comparable sales she used, after adjustments, were $21,000, $19,500 and $21,000. It further was pointed out on cross-examination that the sale of one comparable property was to another family member, another comparable property was zoned only for industrial and not commercial use, and in the third instance, Griffin neglected to take into account the most recent sale of the property for $139,000 an acre.

¶14. Don Harris, the landowners' appraiser, also used a comparable sales approach to valuing the property. As distinguished from Griffin's method of valuing the entire tract at one price per acre, however, Harris stated that the property had two separate highest and best uses and provided two sets of comparable sales figures. While the bulk of the property was best suited to future large scale commercial, such as a shopping center, the highest and best use of the land directly located on the corner of Goodman and Pleasant Hill Roads, some 5.658 acres, was high density commercial, such as gas stations, fast food restaurants, banks and motels. He arrived at the 5.658 acre figure, or 246,450 square feet, taking into consideration the access restrictions created by the intersection and encompassing a property width of 465 feet along Goodman Road and a property depth of 530 feet along Pleasant Hill Road. Using comparable sales and adjusting them for site characteristics as Griffin did, Harris arrived at a value estimate for the 5.658 acre high density commercial area of $2.00 per square foot. For the larger parcel that he characterized as "future commercial large commercial," Harris arrived at a dollar value of $1.15 per square foot, based on comparable sales of $1.10 to $1.23 per square foot, and extremes of $1.10 to $1.63 per square foot. Because he thought that the property could take as long as three years to sell once it was placed on the market, he adjusted the price downward at rate of ten percent per annum for three years, to $.85 per square foot. He further adjusted the value downward by $15,453 for the cost of extending sewer service to the property. He calculated the "before" value of whole tract at $1,746,458. Subtracting the 4.32 acres taken by the

Commission, he arrived at an "after" value of $1,478,539. Harris concluded that the State was taking 95,575 square feet of the high intensity commercial property and 92,604 square feet of the larger commercial tract. Further allowing for an adjustment for the cost of sewer extensions, he calculated the just compensation due the landowners for the taking of the property at $267,919.

III.

¶15. The Special Judge granted the Bridgforths' motion in limine to exclude from the eminent domain proceedings any evidence of the existence or possible existence of grave sites or a cemetery on the property. In his written opinion and order, the Special Judge stated "[h]owever one looks at this 'problem' the question still reverts to one and only issue and that is -- would a reasonably well informed buyer and seller have known of the existence or possible existence of graves on the subject property in September, 1993." The Transportation Commission first contends that the Special Judge applied the wrong legal standard by looking at what a "reasonably well-informed" buyer and seller would know rather than parties who were "fully" informed. The Bridgforths, however, assert that the Transportation Commission is judicially estopped from challenging the use of a legal standard it espoused throughout the motion hearing and further, that it is procedurally barred from raising on appeal an issue to which it did not object in the proceedings below.

¶16. Throughout the motion in limine proceedings, the Transportation Commission consistently maintained that the correct legal standard for the court to apply was that of the "reasonable" buyer and seller. Paragraph 2 of the Commission's response to the Bridgforths' motion in limine clearly states: "A reasonable buyer and seller would have discovered the cemetery. The cemetery's existence was common knowledge." At the motion hearing, the Commission's attorneys reiterated their reliance on the "reasonably well-informed standard." However, the landowners' argument that the Commission is judicially estopped from asserting that a wrong legal standard was employed is without merit. Judicial estoppel is applicable where there has been more than one lawsuit between the same parties and one party knowingly asserts a position inconsistent with that taken in the prior litigation. *State ex rel. Holmes v. Griffin,* 667 So. 2d 1319, 1324 (Miss. 1995); *Hoover v. State*, 552 So. 2d 834, 838 (Miss. 1989). The Commission is not now asserting a position inconsistent with one taken in separate litigation with the landowners; rather, it is merely taking a different position than it took earlier in the same case. It cannot be said, therefore, that the Commission is judicially estopped from raising this argument on appeal.

¶17. The Special Court of Eminent Domain, however, should not be found in error for looking at valuation in terms of what the buyer and seller reasonably would have known at the time of the taking. In the takings context, this Court has defined fair market value as "the sales price that would be negotiated between knowledgeable and self-interested persons, one who wants to purchase and one who wants to sell, the seller being under no obligation or compulsion to sell, and the buyer being under no necessity of having the property." *Potters II v. State Highway Comm'n of Mississippi*, 608 So. 2d 1227, 1231 (Miss. 1992). In *Oughton v. Gaddis*, 683 So. 2d 390 (Miss. 1996), where the highest and best use of land to be taken so as to provide access to a land-locked property was at issue, we reiterated that "to make the fair market value assessment, 'all the facts as to the condition of the property and its surroundings, its improvements and capabilities, may be shown and considered in estimating its value.'" *Oughton*, 683 So. 2d at 393-394 (quoting *Mississippi State Highway Comm'n v. Hillman*, 189 Miss. 850, 870, 198 So. 565, 571 (1940)). The Commission relies on *Bear*

*Creek Water Ass'n, Inc. v. Town of Madison,* 416 So. 2d 399 (Miss. 1982), where not land, but the valuation of a going business and its certificate of public convenience and necessity was at issue. In that case, this Court stated that "the determination of fair market value necessarily requires that both the purchaser and the seller be fully informed of all circumstances involving the value and use of the property so that an approximation of its present worth might be determined." *Bear Creek,* 416 So. 2d at 403. As the landowners point out, the Court also stated that it is important to consider, as of the date of the taking, "all of the factors that a businessman or concern would reasonably consider in determining Bear Creek's value in an open market." *Id.* at 402. The Special Court should not be held in error for considering what a reasonably well-informed buyer and seller would have known at the time of the taking; nothing in our case law imparts the level of omniscience the Commission now seeks to impose.

IV.

¶18. The Transportation Commission further argues that if this Court should find that the Special Judge was correct in making an inquiry into whether a "reasonably well-informed buyer and seller" would have known about the cemetery, it should have been handled as a matter of conditional relevancy pursuant to Miss. R. Evid. 104(b).[(4)] The issue was raised, however, not as an evidentiary ruling at trial, but as a motion in limine to exclude evidence.

¶19. The primary purpose of the motion in limine is to exclude evidence that would be highly prejudicial to the moving party. *Gifford v. Four-County Electric Power Ass'n,* 615 So. 2d 1166, 1172 (Miss. 1992). Therefore, a motion in limine should be granted only when "(1) the material or evidence in question will be inadmissible at a trial under the rules of evidence; and (2) the mere offer, reference, or statements made during trial concerning the material will tend to prejudice the jury." *Whittley v. City of Meridian,* 530 So. 2d 1341, 1344 (Miss. 1988)(quoting *State v. Quick,* 226 Kan. 308, 311, 747 P.2d 1108 (1979)). *See also*, *McCord v. Gulf Guaranty Life Insurance Co.* 698 So. 2d 89, 91 (Miss. 1997); *Davis v. Neshoba County General Hospital,* 611 So. 2d 904, 906 (Miss. 1992).

¶20. Asked at the motion in limine hearing why a reasonably well-informed buyer and seller would want to know of the existence of a cemetery on the subject property, Gary Williams, an Eminent Domain Specialist for the Commission, responded:

> Well, number one: the stigma associated with commercial enterprise building on the property, or in an [sic] cemetery area could cast them in the light of not only maybe doing something illegal, but it could cast them in an uncaring light. People, typically people who have had their forbearers [sic] buried there could take a strong exception to it, and even boycott the commercial facility.

Indeed, Williams further testified that when the Commission knew of a cemetery in the path of a planned road, it would shrink the right-of-way, locate around the site, or as a last resort, move the graves. But for the cost of moving any graves or human remains found, however, no other evidence was given that the presence of graves or grave sites on the property might have an impact on its market value. There is no probative value to the discovery of grave sites in the Goodman Road right-of-way nearly a year after it was taken by the Commission in a trial to determine the adequacy of compensation paid for the "quick take." Further, at the time of the taking, the parties had made

reasonable efforts to substantiate rumors of a cemetery and found no evidence. If the evidence was not relevant and had no probative value that would outweigh any prejudicial effect upon the jury, it would not be admissible. Further, if the pre-trial publicity about the discovery of the grave sites was sufficiently prejudicial to warrant a change of venue from DeSoto to Tunica County, introduction of evidence of their discovery at trial, likewise, would have to be considered prejudicial. We therefore do not hold the Special Court in error for granting the motion in limine.

## IV.

¶21. The Transportation Commission next asserts that even if the Special Court utilized the correct legal standard and that it was the proper entity to determine whether a reasonably well-informed buyer and seller would have known of the existence or possible existence of a cemetery on the property, its finding that a reasonably well-informed buyer and seller would not have known of this cemetery was an abuse of discretion. In support of its argument, the Commission emphasizes facts which came to light *after* the time of the taking and transfer of title to the Commission. Without citing any authority, the Commission further stated:

> The landowners and the Court emphasized the fact that the Highway Department sent its environmental people to the scene and could not confirm the existence of a cemetery. However, we do not look to the actions of the condemning authority. Rather, we look to a hypothetical buyer and seller. Based upon all of the facts set forth in the statement of facts, the evidence is overwhelming that a reasonably well informed buyer and seller would have known of the existence or possible existence of the cemetery.

¶22. The record indicates that there was no physical or documentary evidence of a cemetery or grave sites on the property; to wit, no sign, no headstones and no deeds or other written records on file anywhere. Landowners, family members who have known the property for nearly a century, knew nothing of any graves or grave sites on the property. Because of the proximity of two churches and adjoining cemeteries, the Commission's Environmental Section physically examined the site prior to the taking and found no evidence of graves or grave sites.[5] Its efforts, including bush hogging the property and using a metal detector, revealed nothing. Commission personnel acknowledged that rumors, many of which came to light only *after* the taking, of a cemetery or grave site could not be substantiated. Moreover, the landowners also made every possible effort to investigate reports of a cemetery on the property after they became aware of the rumors which surfaced *after* the taking. Most of those rumors, as well as the recollections[6] of the individuals who attended the school on Pleasant Hill Road in the 1930s, 1940s and 1950s, indicated that any possible grave sites probably would be on the Pleasant Hill Road side of the property, not along Goodman Road, where the actual grave sites were uncovered during construction. The landowners, too, hired an archeologist who discovered suspected grave sites on their property near the Commission's right-of-way on Pleasant Hill Road, but not actually on the land acquired by the State. Further, they contacted Mildred Scott, a local genealogist who is active in a group that keeps up the old cemeteries in the county.[7] Finally, despite all of these efforts by both the Commission and the landowners, some of the grave sites on the condemned property were revealed only after construction was halted and the area was investigated even more extensively.

¶23. It appears from the record that despite the extraordinary efforts of both the Commission and the

landowners to ascertain whether there was a cemetery or graves or grave sites on the property, no actual evidence appeared until construction was in progress, well *after* the date of the taking. While both buyer and seller, who, to say the very least, were reasonably well-informed, might have had knowledge of rumors of a cemetery, graves or grave sites on the property, there was no evidence *at the time of the taking* to substantiate those rumors, despite efforts made to explore the area because of the proximity of old churches and cemeteries. Furthermore, talk of an old cemetery centered around the site on the Bridgforth property on Pleasant Hill Road, *on land not taken by the Commission*, not the Goodman Road right-way-of-way, where the grave sites actually were found during construction. The Special Judge did not abuse his discretion in the findings made.

## V.

¶24. The Highway Commission next asserts that there was insufficient evidence to support the jury verdict, thus warranting a j.n.o.v., or, in the alternative, that the verdict was contrary to the substantial weight of the evidence and a new trial should be granted. Further, although no effort has been made to relate the law to the facts of the case, the Commission has gone to great lengths to set out for this Court the law on remittiturs and additurs. The Commission's evidentiary argument is two-fold: that the testimony of the landowner's expert is based on an imaginary tract and further, that the expert's opinion did not properly apply the before and after rule. The landowners, in response, rely on this Court's decisions in ***Oughton v. Gaddis,*** 683 So. 2d 390, 394 (Miss. 1996) and ***Mississippi State Highway Comm'n v. Hancock,*** 309 So. 2d 867, 870-871 (Miss. 1975), asserting that Harris properly assigned different values to different parts of the property. Further, they contend that there is no evidence of bias, passion, prejudice or any other improper motive so as to warrant the granting of a remittitur to the Commission.

¶25. The jury was presented with two different valuations of the property. The Commission's appraiser, Lucy Griffin, valued the property taken at $19,000 an acre, based on the comparable sales approach to valuation. She valued the entire parcel on general commercial use and arrived at a value for the property taken at $82,100. On cross-examination, the properties used for her comparable sales were assailed by the landowners on the basis of distance in time from the date of the taking, differences in zoning, and less than arms length transactions.

¶26. Harris, the landowner's appraiser, in contrast, looked at the highest and best use of the property, assigning a higher value to that part of the land immediately adjacent to the intersection of Goodman and Pleasant Hill which was suitable for high intensity commercial development. Thus, he used two sets of comparable sales figures: one, on large scale future commercial development; the other, on high density commercial use. He assigned a value of $2.00 per square foot to the small area suited for high intensity commercial development and $.85 per square foot to the large scale commercial area. On cross-examination, the Commission attempted to discredit his assignment of different uses to the property.

## A. Harris' Testimony

¶27. The admission of testimony is within the discretion of the trial court and will be reversed only where there is an abuse of that discretion. *[Mississippi Transportation Comm'n v. Fires,](#) 693 So. 2d 917, 920 (Miss. 1997)*; ***Terrain Enterprises, Inc. v. Mockbee,*** 654 So. 2d 1122, 1228 (Miss. 1995). Where a court has exercised its discretion in such a way that it misperceives the correct legal

standard for the admission of evidence, the deference customarily afforded the lower court will be precluded because the error has become one of law. *Fires,* 693 So. 2d at 920; *Bean v. Broussard,* 587 So. 2d 908, 913 (Miss. 1991).

¶28. The Commission first argues that Harris' valuation of the subject property is based upon an imaginary tract of land with an unbelievably high price per square foot. They cite *Mississippi State Highway Comm'n v. Valentine,* 239 Miss. 890, 124 So. 2d 690 (1960), for the proposition that:

> It is the duty of this Court to determine whether there is any reasonable, believable evidence which will support the verdict in this case. A proper exercise of the judicial function does not require us to believe the incredible. Appellees' witnesses are competent to testify, but because of the extreme, unreasonable, and unsupported valuations which they placed on the land, as analyzed above, their testimony has little probative value.

239 Miss. at 895- 96, 124 So. 2d at 692 (citations omitted). The Commission focuses on Harris' testimony on cross-examination, where he was questioned about the "imaginary tract" to which he had assigned a higher value. Harris' testimony on direct examination laid a foundation for the assignment of a higher value to that land bordering the intersection as well as for the delineation of that particular square footage to which he assigned a value based on high intensity commercial use.

¶29. As distinguished from the Commission's appraisal based on a single per acreage value for the total property,[8] this Court has stated that a piece of property "can have several highest and best uses, and that its value should not be calculated based upon the value of the dominant use. *Our case law does not require that property have a constant per acreage value based upon a single best use.*" *Oughton v. Gaddis,* 683 So. 2d 390, 395 (Miss. 1996)(emphasis added). In *Oughton,* where we found that the lower court erred in finding that the property at issue had only one use: either agricultural or recreational and in disallowing testimony that the area where the easement was to be laid was part of the more valuable river front property, several cases from other jurisdictions were noted with approval for the proposition that:

> When the highest and best use of the property is not uniform throughout the tract in question, an appraiser may testify to the highest and best use for the different portions of the full tract involved. This rule makes sense in light of the purpose of the "just compensation" provision in the constitutions. . . .
>
> Here, the State seeks to take a portion of the full tract that includes a larger percentage of buildable, nonwetland property than does the tract as a whole. Consequently, the application here of the State's proposed rule, that an appraiser must offer only one valuation considering the total value of the entire parcel, would misrepresent the value of the specific land portion to be taken.
>
> *Dep't of Transp. v. HP/Meachum Land Ltd. Partnership*, 245 Ill. App. 3d 252, 185 Ill. Dec. 351, 614 N.E. 2d 485, 488 (1993) (citations omitted). "[G]enerally the market value of the particular part of a tract expropriated is determined by the actual market value of the portion taken, and not by its average per-acre or square-foot value as a pro rata portion of the parent tract." *State Through Dept. of Highways v. LeDoux*, 184 So. 2d 604, 610 (La. Ct. App. 1966) .

*Oughton,* 683 So. 2d at 395. This is consistent with a long line of Mississippi cases which recognize that a property might have more than one highest and best use. *See* **Dennis v. City Council of Greenville,** 646 So. 2d 1290, 1293 (Miss. 1994)(property can have "various uses"); **Potters II**, 608 So. 2d at 1233("Within commercial properties, there are many uses of differing values."); **Daniels v. Board of Supervisors of Clarke County**, 323 So. 2d 748, 749 (Miss. 1975)(property valuation not limited to present use, "but with reference to any use to which it is reasonably adapted"); **Mississippi State Highway Comm'n v. Hancock**, 309 So. 2d 867 (Miss. 1975)(property's value enhanced by its adaptability to different uses); **Mississippi State Highway Comm'n v. Brooks,** 239 Miss. 308, 316-317, 123 So. 2d 423 (1960)(property taken should be valued not just with reference to present use, but to highest and best use); **State Highway Comm'n v. Brown,** 176 Miss. 23, 33, 168 So. 277, 279 (1936)(property may have several uses or purposes and consideration must be given to fair market value of each).

¶30. As discussed in **Fires,** condemned land "should be appraised with reference to any use to which it is reasonably adapted, and therefore, the best or most valuable use to which the property could reasonably be expected to be adapted is the use which should be considered, regardless of the current use of the property." *Fires,* 693 So. 2d at 922; **Brooks**, 239 Miss. at 316- 317, 123 So.2d at 427. Further,

> [t]o warrant admission of testimony as to the value for purposes other than that which the land is being put, or to which use is limited by ordinance at the time of the taking, the owner must first show: (1) that the property is adaptable to the other use; (2) that it is reasonably probable that the property will be put to the other use within the immediate future, or within a reasonable time; (3) and that the market value of the land has been enhanced by the other use for which it is adaptable.

*Fires*, 693 So. 2d at 922 (*citing* **Mississippi State Highway Comm'n v. Rogers**, 236 Miss. 800, 112 So. 2d 250 (1959)). The potential for development is a factor to be considered in determining the value of the property. **Paulk v. Housing Authority of the City of Tupelo,** 204 So. 2d 153, 155 (Miss. 1967). However, "'[m]ere speculative uses cannot be considered.'" **Mississippi State Highway Comm'n v. Wagley,** 231 So. 2d 507, 509 (Miss. 1970)(*quoting* **Brooks,** 239 Miss. at 316, 123 So. 2d at 427). *"*There must be a present demand for the land for such purpose or a reasonable expectation of such demand in the near future." **Brooks**, 239 Miss. at 317, 123 So. 2d at 427; **Redevelopment Authority of the City of Meridian v. Holsomback,** 291 So. 2d 712, 714 (Miss. 1974).

¶31. Harris' testimony was neither speculative nor inconsistent with the present zoning of the land. Our case law recognizes that a parcel of land might have more than one highest and best use. Indeed, Harris provided an adequate foundation for the delineation he made between that part of the property to which he assigned a higher value and that to which the lower large scale commercial valuation was applicable. Further, as discussed *infra,* Harris' valuation was proper pursuant to **Hancock** and **Oughton.**

B. **Hancock**

¶32. The Commission further asserts that **Mississippi State Highway Comm'n v. Hancock**, 309 So.

2d 867 (Miss. 1975), which this Court reaffirmed in *Oughton, supra,* is inapplicable because, as distinguished from the case *sub judice*, where the land could be used either for agricultural purposes or residential development, there is only one highest and best use of the land now at issue: commercial. However, as we recognized in *Potters II,* "[w]ithin commercial properties, there are many uses of differing values." 608 So. 2d at 1233. Indeed, Harris testified that while the larger parcel was suitable for future commercial sales, the highest and best use of the 5.658 acres at the intersection was high intensity commercial, such as service stations, motels, and fast food restaurants. His findings, too, were well within the parameters of the property's zoning for commercial use.

¶33. Next, the Commission suggests that even if *Hancock* is applicable, then it is bad law and should be overruled. The Commission argues that "[i]n all cases where a road is widened, the portion of the property adjacent to the highway is always the most valuable, particularly in a commercial situation. If we view the law as the Court in *Hancock* did then the Court would always pay the landowner an inflated value for the commercial footage even though the landowner has the same frontage after condemnation." In essence, the Commission's objection to *Hancock* appears to be based on its reinforcement of the principle that fair market value should be paid for property taken.

¶34. In *Hancock,* the Commission condemned property on either side of Highway 49 to widen it to four lanes. While the larger parcel from which the land was taken was used for agricultural purposes, there was evidence that the highest and best use for the land along the highway was rural residential. *Hancock,* 309 So. 2d at 868-869. Thus, the Commission championed a valuation based on $300 to $350 an acre based on agricultural use of the entire parcel. The landowner, however, introduced evidence that anywhere from 100 to 280 acres of the 1,359 acre larger parcel was valued at $1,250 per acre for residential use. *Id.* The *Hancock* Court found that this evidence was both relevant and competent, and properly before the jury to consider its weight and credibility. *Id.* at 870. It summarized the Commission's argument as follows:

> Apparently, the appellant is actually contending the testimony of the witnesses for the landowners has no probative value because they failed to take into consideration the fact that following the widening of the highway, the landowners have other land that is now classified as farm land, which can afterwards be substituted for the residential property taken. Thus, the landowners will still have as much residential property as they had before the taking. Consequently, the appellant argues that the appraisers could only value the land taken as farm land. We find no merit in this contention.

*Hancock,* 309 So. 2d at 870-871. This is essentially the same argument the Commission appears to make in the case *sub judice* in its assertion that the landowners still have the same high intensity commercial acreage they did before, even though they have less land for large scale commercial development. However, as we further explained in *Hancock*,

> The rule in this state is that when a part of a larger tract of land is taken for public use, the owners should be awarded the difference between the fair market value of the whole tract immediately before the taking and the fair market value of the remaining property immediately after the taking, without considering the general benefits or injuries to the use of the taken land. *This rule leaves no room for a deduction for any enhancement of the remaining land due to the nature of the facility to be built on the land taken.* Furthermore, the landowner is entitled to

due compensation not only for the value of the property actually taken, but also for the damages, if any, which may result to the landowner as a consequence of the taking without any deduction therefrom on account of any supposed benefits incident to public use for which the application is made. *Pearl River Water Supply District v. Wood*, 252 Miss. 580, 172 So. 2d 196 (1965) and *Mississippi State Highway Commission v. Hillman,* 189 Miss. 850, 198 So. 565 (1940).

Although approaching it in a novel manner, *what appellant is contending amounts to nothing more than a contention that the widening of the highway will enhance the value of other land not taken and consequently, it is entitled to a set off of the value of the enhancement from the value of the land taken. While this is the rule in some jurisdictions, it is not the rule in this state.*

*Hancock,* 309 So. 2d at 871 (emphasis added). *See also* **State Highway Commission v. Chatham,** 173 Miss. 427, 433, 161 So. 674 (1935)("the rule in this state is familiar to all that when a part of the property so enhanced in value is to be taken for the public improvement, no deduction is to be made out of the value of the part taken on account of the enhancement to the value of the remainder not taken."). We find no merit or authority for the Commission's invitation to overrule *Hancock,* save its apparent desire to pay less than fair market value for properties taken.

## C. The Jury's Award

¶35. In *State Highway Comm'n of Mississippi v. Havard,* 508 So. 2d 1099 (Miss. 1987), this Court quite thoroughly set forth the standard of review for jury verdicts in eminent domain cases as follows:

As in the case of any other jury determination of damages, we are not at liberty to order a new trial unless the verdict is so at variance with the evidence as to shock the conscience of the court. Except where the verdict is grossly excessive and evinces bias, passion and prejudice by the jury, we have no authority to require the prevailing party to submit to a second adjudication. This rule applies in eminent domain cases as in others. *See, e.g.,* **Mississippi State Highway Commission v. Franklin County Timber Co., Inc.,** 488 So. 2d 782, 787 (Miss. 1986); **Trustees of Wade Baptist Church v. Mississippi State Highway Commission,** 469 So. 2d 1241, 1245 (Miss. 1985); **Mississippi State Highway Commission v. Baker,** 241 Miss. 738, 133 So. 2d 277, 278-79 (1961); **Mississippi State Highway Commission v. Ellzey,** 240 Miss. 689, 128 So. 2d 561, 562 (1961).

We are particularly loathe to disturb a jury's eminent domain award where, as here, the jury has personally viewed the premises. *Ellis v. Mississippi State Highway Commission,* 487 So. 2d 1339, 1342 (Miss. 1986); *Mississippi State Highway Commission v. Terry*, 288 So. 2d 465, 466 (Miss. 1974); *Mississippi State Highway Commission v. Turnipseed,* 236 Miss. 764, 766-67, 111 So. 2d 925, 926 (1959). We have gone so far as to suggest that, where the jury has viewed the property being taken, any substantial evidence in the record supporting the jury's damage assessment will preclude reversal in this Court. *Mississippi State Highway Commission v. Franklin County Timber Co., Inc.*, 488 So. 2d at 787; *City of Jackson v. Landrum,* 217 Miss. 10, 63 So. 2d 391 (1953).

*Havard,* 508 So.2d at 1105. In the case *sub judice,* the jury traveled from Tunica County to DeSoto

County to view the property. It was presented with the testimony of two expert witnesses. One valued the property as a total parcel with only one possible use, using comparable sales figures that were largely discredited on cross-examination. *See **Fires,** 693 So. 2d at 923*("this Court encourages the judge to allow liberal cross-examination to permit testing of the true utility of comparable sales. . . [h]owever, if the evidence shows that the comparables are entirely different from the property taken, then the valuation should be discredited."). The other testified that the property had more than one highest and best use; that part of it was suitable for large-scale commercial development and part, at the intersection of Goodman and Pleasant Hill Roads, should be valued at the higher price commanded by high intensity commercial property. Among the many comparable sales figures presented was the January, 1992 sale of a high intensity parcel across the intersection from the landowners' property for an adjusted price of $3.67 per square foot. There is substantial evidence in the record to support the jury's findings. Further, we cannot say, nor does the Commission present any evidence to suggest, that the jury's award is the result of bias, passion or prejudice, or that it should shock the conscience of this Court.

V.

¶36. The Special Court of Eminent Domain properly granted the landowner's motion in limine to keep from the jury evidence of graves and grave sites found on the site after the Commission received title to the land pursuant to our statutory "quick take" procedure. Efforts were made to investigate rumors known to the parties about an old cemetery on Pleasant Hill Road, but no actual evidence of any grave sites on Goodman Road actually came to light until at least a year after the taking. As to those rumors circulating at the time of the taking, an abandoned cemetery ultimately was found on Pleasant Hill Road well after the taking --on the landowners' remaining property, and not on the Commission's right-of-way. Valuation is based on factors known at the time of the taking. The discovery of graves and grave sites during construction is not relevant to the valuation of the property at the time of the taking and further, the pre-trial publicity the discovery generated was sufficiently prejudicial to warrant a change of venue. Under the facts of this case, the Special Court properly kept the evidence from the jury.

¶37. The testimony of the landowners' appraiser, Don Harris, was properly admitted. His testimony was not speculative and he provided an adequate foundation for the appraisal of two distinct highest and best uses of the land. *Hancock*, indeed, is applicable to the case *sub judice* and we decline the Commission's invitation to overrule it. Finally, there is substantial evidence in the record to support the jury's award to the landowners. We therefore affirm the decision of the Special Court of Eminent Domain.

¶38. **JUDGMENT IS AFFIRMED.**

**SULLIVAN AND PITTMAN, P.JJ., BANKS, ROBERTS, MILLS AND WALLER, JJ., CONCUR. PRATHER, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, J.**

**PRATHER, CHIEF JUSTICE, DISSENTING:**

¶39. I respectfully dissent. In my view, this Court has already spoken on the issue of the standard properly employed in the case at bar. As noted by the majority, this Court held in *Bear Creek Water Ass'n v. Town of Madison*, 416 So.2d 399, 403 (Miss. 1982) that "the determination of fair market value necessarily requires that both the purchaser and the seller be fully informed of all circumstances involving the value and use of the property so that an approximation of its present worth might be determined." The majority distinguishes *Bear Creek* based on the fact that *Bear Creek* involved the valuation of a going business, but I read nothing in the central holding of *Bear Creek* which reserves the "fully informed" standard to cases involving a "going business." To the contrary, this Court in *Bear Creek* held that the "fully informed" standard should be utilized in the valuation of "property."

¶40. I therefore consider the "fully informed" standard to be applicable to the case at bar, and not the "reasonably well-informed" standard utilized by the trial court. Any doubt in this regard is removed by the fact that, in setting forth the "fully informed" standard in *Bear Creek*, this Court approvingly cited *Wheeler v. State Highway Comm.*, 212 Miss. 606, 55 So.2d 225 (1951) and *Mississippi State Highway Comm. v. Hillman*, 189 Miss. 850, 198 So. 565 (1940). This Court in *Wheeler* held that "[t]he jury has a right to take into consideration any element which will affect the fair market value of the land remaining." *Wheeler*, 212 Miss. at 614, 55 So. 2d at 227. This Court in *Hillman* similarly held that "[a]ll the facts as to the condition of the property (land) and its surroundings, its improvements and capabilities, may be shown and considered in estimating its value'." *Hillman*, 189 Miss. at 870, 198 So. 2d 571 (citations omitted).

¶41. I see very little room for uncertainty in this Court's holdings that "any element which will affect the fair market value of the land remaining" and "all the facts as to the condition of the property" may be considered by the jury in determining the value of property. There is clear evidence in the record that the existence of a cemetery under property may affect the value of the property, and this evidence was relevant under *Bear Creek/Wheeler/Hillman*. In my view, the jury should therefore have been permitted to consider the existence of the cemetery in valuing the property in question, and the trial judge's failure to permit the jury to do so constitutes reversible error. I would reverse and remand for a new trial, and I must respectfully dissent.

**SMITH, J., JOINS THIS OPINION.**

1. As a result of the pre-trial publicity arising from the MDOT's discovery of grave sites in the Goodman Road right-of-way in September, 1994, both parties sought a change of venue for the proceedings. Although the Commission subsequently filed a motion to withdraw its motion for change of venue, the Special Court overruled that motion and granted the change of venue to Tunica County on July 10, 1995.

2. At trial, an offer of proof was made that the Commission's appraiser, Lucy Griffin, heard rumors of graves or grave sites on the property in 1991 or 1992 and wrote a memo to the Jackson office.

3. Subsequently, on April 11, 1997, the Commission filed an Amended Statement of Values declaring the fair market value of the property, as of September 8, 1993, to be $64,700. The price was amended downward to compensate for the cost of moving the graves found in the Goodman Road

right-of-way.

4. The Commission contends that the case law interpreting Rule 104(b) is "nebulous and in need of clarity." In as much as the issue was not before the lower court, our inquiry today is limited to the propriety of the Special Court's granting of the motion in limine.

5. Miss. Code Ann. § 39-7-22 (1996), the Antiquities Law, provides for the survey of publicly-funded construction sites for historically significant sites and landmarks.

6. Depositions of residents were taken in May, 1996, to supplement the Commission's response to the landowners' motion in limine.

7. Miss. Code Ann. § 39-5-19 (1996) gives county boards of supervisors the authority to restore and maintain abandoned cemeteries with any historic significance once a certificate is issued by the Department of Archives and History.

8. The entire property is zoned C-4, planned commercial, which encompasses the whole gamut of commercial uses from outdoor recreation to carry-out restaurants. This Court has noted that "*property must not be evaluated as though the rezoning were already an accomplished fact. It must be evaluated under the restrictions of the existing zoning and consideration given to the impact upon market value of the likelihood of a change in zoning.*" ***Mississippi State Highway Comm'n v. Wagley,*** 231 So. 2d 507, 509(Miss. 1970)(emphasis in original)(*quoting* Nichols on Eminent Domain, Market Value, § 12.322(1)(1962)). Harris' evaluation took into consideration commercial land uses that were well within the parameters of the zoning designation.