# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CA-00583-SCT

*HARRAH'S VICKSBURG CORPORATION, A NEVADA CORPORATION AND AMERISTAR CASINOS INC., A NEVADA CORPORATION*

*v.*

*E. L. PENNEBAKER, JR., JAMES BELISLE, MULTI GAMING MANAGEMENT, INC., A MINNESOTA CORPORATION AND MULTI GAMING MANAGEMENT OF MISSISSIPPI, INC., A MISSISSIPPI CORPORATION*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/05/1999 |
| TRIAL JUDGE: | HON. MIKE SMITH |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | NEVILLE H. BOSCHERT |
| | R. DAVID KAUFMAN |
| ATTORNEY FOR APPELLEES: | WILLIAM E. SPELL |
| | WAYNE DOWDY |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND RENDERED - 10/31/2001 |
| MOTION FOR REHEARING FILED: | 11/8/2001; denied 2/7/2002 |
| MANDATE ISSUED: | 4/17/2002 |

### BEFORE McRAE, P.J., MILLS AND WALLER, JJ.

### MILLS, JUSTICE, FOR THE COURT:

¶1. On February 27, 1998, E.L. Pennebaker, Jr. (Pennebaker) and James F. Belisle (Belisle), Multi Gaming Management, Inc. (MGM) and Multi Gaming Management of Mississippi, Inc. (MGM of MS) filed an amended complaint against Harrah's Vicksburg Corporation (Harrah's), Ameristar Casinos, Inc. (Ameristar), Riverboat Corporation of Mississippi Vicksburg (Isle of Capri) and Deposit Guaranty National Bank (Deposit Guaranty) alleging that they conspired to oppose and defeat a proposal by Horseshoe Gaming, Inc. (Horseshoe) seeking approval of the Mississippi Gaming Commission (MGC) to build a casino and automobile racetrack project on the Big Black River in Warren County approximately fifteen miles east of Vicksburg. Pennebaker and the others asserted that the casinos and the bank violated Mississippi gaming statutes and antitrust laws, tortiously interfered with contracts between them and Horseshoe, and illegally conspired to defeat the Horseshoe application pending before the MGC. The defendants filed motions for summary judgment which were subsequently denied. The trial court did, however, grant summary judgment for the defendants with the plaintiffs' consent on the plaintiffs' fraud claim. Prior to trial, Isle of Capri reached a settlement with the plaintiffs and was dismissed as a defendant.

¶2. A jury trial was held October 18, 1999, through October 27, 1999. Prior to the case going to the jury, the plaintiffs agreed that the claims of Belisle, MGM of MS, and MGM should be made as one claim with MGM as the plaintiff. The jury returned a verdict in favor of Pennebaker for $1,042,000 and for MGM in the amount of $2,950,000 for restraint of trade, conspiracy, and tortious interference with contract. Taking into account the Isle of Capri settlement, the court entered final judgment in favor of Pennebaker for $942,000 and MGM for $2,850,000. All post-trial motions for judgment notwithstanding the verdict or, in the alternative, for new trial, were denied. The defendants timely perfected this appeal. After filing the appeal, Deposit Guaranty settled with the plaintiffs, and this Court entered an order dismissing the bank as an appellant. Only Harrah's and Ameristar are appellants in this appeal.

## FACTS

### Background

¶3. In 1990, the Mississippi Legislature legalized gaming along the shores of the Gulf Coast and along the Mississippi River. *See* Miss. Code Ann. § 97-33-1(a), (b) (2000). "More specifically, in the river counties, the Mississippi Code authorizes gaming '[o]n a vessel as defined in § 27-109-1 whenever such vessel is on the Mississippi River or *navigable waters within any county bordering on the Mississippi River*, and in which the registered voters of the county in which the port is located have not voted to prohibit such betting, gaming, or wagering on vessels as provided in § 19-3-79.'" ***Miss. Casino Operators Ass'n v. Miss. Gaming Comm'n***, 654 So. 2d 892, 893-94 (Miss. 1995) (quoting Miss. Code Ann. § 97-33-1(b)) (emphasis in original).

¶4. The legislature established the Mississippi Gaming Commission to regulate the development and operation of gaming in this state. Miss. Code Ann. § 75-76-1 to -34 (2000). "The legislature delegated broad powers to the MGC for handling the development of gaming in Mississippi." ***Casino Magic Corp. v. Ladner***, 666 So. 2d 452, 459 (Miss. 1995). The Gaming Control Act has vested the MGC with the authority to determine the locations of casinos in Mississippi. *See **Miss. Casino Operators Ass'n***, 654 So. 2d at 894. The MGC has the express authority to make the final decision on findings of site suitability as well as other financial and character suitability factors required for a gaming license in Mississippi. ***Ladner***, 666 So. 2d at 459.

¶5. The MGC is charged with the authority and responsibility to promulgate regulations "as it may deem necessary or desirable in the public interest in carrying out the policy and provisions of [the Act]." Miss. Code Ann. § 75-76-33(1). The MGC also has the authority to make appropriate investigations both to determine whether there has been a violation of the act or of any regulations adopted under the act and "to determine any facts, conditions, practices, or matters which it may deem necessary or proper to aid in the enforcement of any such law or regulation." *Id.* § 75-76-103(1)(a), (b).

### Gaming in Warren County

¶6. The City of Vicksburg is located within Warren County on the Mississippi River. The residents of Warren County have voted pursuant to Miss. Code Ann. § 19-3-79 to allow riverboat gaming in that county. The Mississippi Legislature has not authorized gaming in Hinds County which adjoins Warren County.

¶7. The MGC has licensed four casinos to operate in Vicksburg. These are Harrah's, Ameristar, Isle of

Capri, and Rainbow. None of these casinos has ever opposed the licensing of additional casinos in Vicksburg.

¶8. In 1993, MGM sought to develop a casino and automobile racetrack near Redwood, Mississippi, on the Yazoo River in Warren County, ten miles north of Vicksburg. The MGC granted MGM's initial application for preliminary approval of the Redwood site. MGM defaulted on its payments for the options to buy the Redwood site, however; and the landowners sued for payment or rescission of the options. MGM settled with the landowners and set out to find another location for its proposed casino and race track. The Big Black River Proposal

¶9. The Big Black River forms the boundary between Warren County and Hinds County. Warren County lies generally to the west of the river and Hinds County to the east; however, less than a mile south of the Interstate 20 intersection with the Big Black River, the river turns and runs east/west for approximately four miles, roughly parallel to the interstate with Warren County to the north and Hinds County to the south. The "Flowers" exit, or Exit 15, is the only exit on Interstate 20 along this four-mile stretch of the river.

¶10. In April 1996, MGM acquired options to buy a piece of property on this four-mile stretch of the Big Black, running from the river to the interstate just west of the Flowers exit. This area was known as the "Henry" property. MGM filed an application with the MGC for approval of this property as a legal and suitable site for gaming. On August 15, 1996, MGM and Horseshoe executed a letter of intent providing MGM with a 15% interest in the proposed casino project on the Henry property. Horseshoe was to retain the other 85%. MGM ultimately withdrew its application for approval due to opposition by historical preservation groups concerned that a casino and race track would jeopardize a nearby Civil War battle site. Horseshoe then acquired its own options to purchase a nearby site known as the Hooker property. In November, 1996, Horseshoe filed an application with the MGC for preliminary approval of this site. The site application stated that Horseshoe owned 100% of the project. Horseshoe never submitted any document indicating that MGM had any ownership interest in the Hooker project.

¶11. Pennebaker owned property near the Flowers exit south of Interstate 20. On October 19, 1996, Pennebaker entered into a written agreement with Horseshoe under which Horseshoe agreed to purchase Pennebaker's ownership interest in Flowers Development Corporation and Flowers Development, L.P., for $1,092,000 in the event the Horseshoe Big Black gaming site was approved by the MGC. Under the agreement, Pennebaker was to give Horseshoe certain right-of-way over the 22-acre property so that Horseshoe could access the site for which it had applied for a gaming license. Pennebaker was paid $50,000 in advance pursuant to the agreement and was to be paid $1,042,000 at the closing upon approval of the Big Black site.

Opposition to the Proposed Site

¶12. The City of Vicksburg and several businesses in the area opposed approval of this site. Their opposition is evidenced by letters written to the MGC and testimony before the MGC based upon the potentially disastrous effect the development would have on the Vicksburg economy. Local churches and other religious groups also opposed approval of gaming on this site. Historical groups opposed the Hooker site as they had opposed the previous Henry site due to its close proximity to the Civil War battlefield. Naturalists opposed the site because of the negative impact the project would have on fossils and other paleontological artifacts located in that area along the Big Black River. Environmental groups opposed the site because of the potential effect on endangered species in the area. Nearby landowners opposed the site

because of traffic, pollution, and noise from operation of the proposed race track.

¶13. Harrah's, Ameristar, and Isle of Capri (sometimes referred to as the "Vicksburg casinos") also opposed this site as both illegal and unsuitable for gaming. They considered such an inland site fifteen miles east of the Mississippi River to have devastating effects to their economic viability. The casinos wrote the MGC directly to express their opposition to the site and also employed public relations consultants to make their views known to the MGC and the general public.

¶14. On July 26, 1996, Ameristar CEO Craig Neilsen sent a letter to General Paul Harvey, Executive Director of the MGC, setting forth Ameristar's opposition to the Big Black River site. Neilsen stated in his letter as follows:

> While we welcome competition in the City of Vicksburg, a casino development along the river in Bovina would devastate the economic progress that has been made in Vicksburg. Ameristar invested in Vicksburg with the knowledge there would be competition, both now and in the future, but it was understood that all participants would be competing on a level playing field. With the kind of investment Ameristar has made in Vicksburg, the impact of a Big Black River development extends all of the way from Vicksburg residents employed by the casinos to the local banking community that shares in our investment and Ameristar's stockholders who have a tremendous financial stake in the Company's Mississippi operation.

¶15. Among the consultants hired by the Vicksburg casinos was Alan Huffman. Huffman presented a study to the MGC alleging the proposed Big Black gaming site to be unsuitable due to its interference with historical sites and endangered species. Huffman brokered an idea between certain state agencies, particularly those related to Civil War battlefields, and the casinos whereby the casinos would provide grants in the amount of $320,000 to the Mississippi Heritage Trust to preserve the historic Civil War sites through a heritage corridor preventing casino development. It was understood that the money would be paid only if the heritage corridor succeeded in precluding casino development along the Big Black River. Once the MGC turned down the Big Black site, the casinos' offer to establish a heritage corridor faded away.

¶16. Chris Webster was an attorney employed by Harrah's to help oppose the Big Black proposal. In a memorandum to Fred Keaton, State Government Affairs Liaison for Harrah's, Webster described a meeting he had with Clarke Reed, a close friend and advisor of Governor Kirk Fordice. Webster opined that Reed maintained a great deal of influence with the Governor on gaming matters. Webster suggested continuous contact with the Governor to ensure his agreement that no gaming development should be approved on the Big Black River. Webster's strategy also included discussing the matter and any developments with Bill Gresham, Chairman of the MGC, and Victor Smith, a member of the MGC. Webster advised Keaton that "we will pull out all the stops if necessary."

¶17. Giselle D. Russell is a consultant in matters of public affairs, press relations, issues management, and marketing. She owns and operates a company called Strategics, Inc., in Jackson. Russell was employed by the Vicksburg casinos to conduct public relations activities and to coordinate grassroots and community advocacy programs designed to oppose approval of a casino site on the Big Black River. As campaign manager on behalf of the casinos to halt approval of the site, Russell developed a plan which included circulation of petitions opposing the site, letters to the editor from casino employees, letters to the Warren County Board of Supervisors from casino employees, letters to the MGC from casino employees, phone

calls to members of the Board of Supervisors, and phone calls requesting vendors of the casinos to oppose the Big Black site. In a memorandum to representatives of Harrah's and Ameristar dated September 3, 1996, Russell stated that the Governor had told Commissioner Gresham that he had better vote down the project "or else." The memorandum also stated that "Gresham is really feeling the pressure . . . looking for his way out."

## The Plaintiffs' Lobbying Efforts

¶18. Pennebaker, MGM, Horseshoe, and other proponents of the Big Black site undertook similar efforts to influence the MGC, seeking support from many of the same persons and groups that the Vicksburg casinos had recruited. Such efforts included face-to-face meetings with the Commissioners and the Executive Director, letter-writing campaigns to the local newspapers, and meetings with area business leaders, historic groups, city government officials, the Warren County Port Commission, the Warren County Economic Development Commission, and numerous state legislators. The plaintiffs contacted Jimmy Heidel, former director of the Mississippi Department of Economic and Community Development, to request that he encourage the Governor to support the site. They contacted the Governor's son for the same purpose. Horseshoe also attempted to retain Giselle Russell to assist in the plaintiffs' lobbying efforts, but she declined because she was already employed by the Vicksburg casinos.

## Mississippi Gaming Commission Hearing

¶19. On November 16, 1996, the MGC held a hearing to gather evidence considered necessary for its determination of the legality and suitability of the Big Black River gaming site. Public relations consultants hired by the Vicksburg casinos appeared at the hearing to oppose the Big Black site. Among the consultants was Alan Rachels, who presented a document identified as the Crowe-Chizek "Warren County Gaming Impact Study." The study reported in part the following:

> A casino located on the Big Black River would jeopardize the existence of the four Vicksburg casinos. According to our analysis, there is a strong potential that 66% of Vicksburg's current market would switch to the Big Black development. An additional 14% would be potentially lost to Shreveport/Bozier City, Louisiana.

> If gaming were allowed on the Big Black River, it is unlikely that more than one casino in Vicksburg could survive in the remaining market.

¶20. Though this study was characterized as an "independent" study, evidence revealed that Ameristar had some involvement with the report. An internal Ameristar memo, dated July 25, 1996, stated that Ameristar "hired Crowe-Chizek to conduct a market study (cannibalization study) nobody can get one done in time." Several other internal memos indicated more involvement. For instance, a memo from Ameristar CEO, Craig Neilsen, dated September 18, 1996, stated the following:

> I think that I should be taken off as a reference for Crowe-Chizek for this report. Additionally, what do you think of listing Harrah's as a reference?

> In addition to Brian's comments on form, on page 4, first paragraph, either the "occur" or "happen" should be deleted from the text. This is a duplication.

> Please incorporate John, Brian and my comments and then the report can be issued.

¶21. Communications from Crowe-Chizek also indicated the extent of Ameristar's involvement in the study. In a faxed document dated October 6, 1999, Crowe-Chizek stated the following:

> Jeff Terp asked me to fax this to you for internal distribution. Please review and comment. We have not written a conclusion and await your thoughts.

¶22. Prior to the MGC's vote on the Big Black site, Chairman Gresham met with Governor Fordice to discuss the Big Black site on a number of occasions. According to Gresham's testimony, the Governor told him that the Big Black was not a good site and that he was against it.

¶23. Howard McMillan was president of Deposit Guaranty National Bank when the application of the proposed Big Black site was pending. Craig Neilsen of Ameristar contacted McMillan in the summer of 1996 and asked him to make contacts on behalf of Ameristar, which was a customer of Deposit Guaranty. McMillan agreed and thereafter met with John Palmer, a member of the Board of Directors of Deposit Guaranty, and Victor Smith, a member of the MGC and the Deposit Guaranty Advisory Board. About the same time, McMillan also contacted Bill Gresham and urged the Chairman's opposition to the Big Black site.

¶24. Don Miller, a former alderman of the City of Vicksburg, testified that he opposed the Big Black River site because it would harm the city. Miller testified that virtually all Vicksburg businesses and business organizations opposed the Big Black River site.

¶25. At the MGC's December 16, 1996, meeting, General Harvey recommended pursuant to Miss. Code Ann. § 75-76-77 that the Big Black River site be denied approval as "not suitable for gaming operations." Two of the three Commissioners concurred with the executive director's recommendation, and the MGC adopted the recommendation and denied preliminary approval of the Big Black River site as unsuitable for gaming pursuant to § 75-76-77.

¶26. Pennebaker and Horseshoe appealed the MGC's ruling to the Hinds County Circuit Court pursuant to Miss. Code Ann. § 75-76-121. On December 16, 1997, Hinds County Circuit Judge L. Breland Hilburn entered an order reversing and vacating the MGC's decision. Judge Hilburn concluded that the site was legal and that any legal site, as a matter of law, was suitable for gaming under the Gaming Control Act. The MGC appealed to this Court pursuant to Miss. Code Ann. § 75-76-127.

¶27. After the MGC filed its appeal, Pennebaker filed a petition with the MGC alleging that Harrah's, Ameristar, and Isle of Capri had violated the Gaming Control Act by "conduct[ing] an aggressive campaign in opposition to the application of Horseshoe Gaming, Inc., for a gaming site on the Big Black River with the specific purpose and the objective of having The Mississippi Gaming Commission deny Horseshoe's application." Pennebaker subsequently filed this lawsuit on February 23, 1998, against Harrah's, Ameristar, Isle of Capri, and Deposit Guaranty alleging that they conspired to restrain trade by opposing approval of the Big Black River site. On February 27, 1998, an amended complaint was filed adding as plaintiffs Belisle, MGM, and MGM of MS. After the trial court denied all of the defendants' summary judgment motions, trial was held in October, 1999. The jury found for the plaintiffs and awarded Pennebaker $1,042,000 and MGM $2,950,000. After crediting the defendants for the plaintiffs' $200,000 settlement with Isle of Capri, the circuit court entered judgment in favor of Pennebaker for $942,000 and MGM for $2,850,000. The trial court denied the defendants' motions for judgment notwithstanding the verdict, and defendants timely perfected this appeal. Deposit Guaranty subsequently settled with the plaintiffs and was

dismissed from the appeal, leaving Harrah's and Ameristar as the only remaining appellants in this case.

## STANDARD OF REVIEW

¶28. This Court reviews issues of law de novo. *Cook v. Children's Med. Group, P.A.*, 756 So. 2d 734, 739 (Miss. 1999). The standard of review for the denial of a motion for judgment notwithstanding the verdict and a motion for directed verdict are identical. *Miss. Transp. Comm'n v. Ronald Adams Contractor, Inc.*, 753 So. 2d 1077, 1083 (Miss. 2000) (citing *Steele v. Inn of Vicksburg, Inc.*, 697 So. 2d 373, 376 (Miss. 1997)). "This Court will consider the evidence in the light most favorable to the appellee, giving the appellee the benefit of all favorable inferences that may be reasonably drawn from the evidence." *General Motors Acceptance Corp. v. Baymon*, 732 So. 2d 262, 268 (Miss. 1999) (citing *Steele*, 697 So.2d at 376). If the facts are so overwhelmingly in favor of the appellant that a reasonable juror could not have arrived at a contrary verdict, this Court must reverse and render. *Id.* On the other hand, if substantial evidence exists in support of the verdict, that is, "evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions," then this Court must affirm. *Id.* "When determining whether a trial court erred in refusing a new trial, this Court reviews for abuse of discretion." *Ronald Adams*, 753 So. 2d at 1083 (citing *Lewis v. Hiatt*, 683 So. 2d 937, 941 (Miss. 1996)).

## DISCUSSION

### WHETHER THE PLAINTIFFS' CLAIMS ARE BARRED BY THE *NOERR-PENNINGTON* DOCTRINE.

¶29. The appellants assert that all of the appellees' claims are precluded by the *Noerr-Pennington* doctrine which protects the constitutional right to petition legislatures, governmental agencies, and courts and ensures the free flow of information to governmental decision makers. The plaintiffs argue that the *Noerr-Pennington* doctrine does not provide immunity for the appellants in this case. The plaintiffs argue that the state had the constitutional power to prohibit competing dealers and their aiders and abettors from combining to restrain freedom of trade. They assert that the state has a substantial interest in assuring that gaming in Mississippi is regulated honestly and competitively and that the state may therefore regulate the speech of the appellants related to the Big Black proposal.

¶30. The United States Court of Appeals for the Fifth Circuit has summarized the *Noerr-Pennington* doctrine as follows:

The *Noerr-Pennington* doctrine and the exceptions to it grew from two Supreme Court cases: *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.* 365 U.S. 127 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965). The essence of the doctrine is that parties who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws even though their petitions are motivated by anticompetitive intent. Thus, railroads that embark on advertising campaigns designed to convince legislatures to pass laws detrimental to the trucking industry are not subject to antitrust liability for those actions even though their ultimate goal is to drive trucks out of business and limit the competition. Similarly, "petitions" made to the executive or judicial branches of government, e.g., in the form of administrative or legal proceedings, are exempt from antitrust liability even though the parties seek ultimately to destroy their competitors through these actions.

*Video Int'l Prod., Inc. v. Warner-Amex Cable Communications, Inc.*, 858 F.2d 1075, 1082 (5th Cir. 1988).

¶31. The *Noerr-Pennington* doctrine applies in state court and to state law claims because it is grounded on First Amendment rights to petition the government. The First Amendment is made applicable to state government through the Fourteenth Amendment. Furthermore, the Mississippi Constitution, like the United States Constitution, grants protection for free speech, the right to petition governmental bodies, and the use of the courts to address grievances. Miss. Const. art. 3, §§ 11, 13, 24, & 25. Consequently, the *Noerr-Pennington* doctrine is equally applicable under state law.

¶32. Although the *Noerr-Pennington* doctrine originated in the interpretation of federal antitrust laws, this Court has explicitly recognized its applicability to claims under Miss. Code Ann. §§ 75-21-1 et seq. *NAACP v. Claiborne Hardware Co.*, 393 So. 2d 1290 (Miss. 1980), *rev'd on other grounds*, 458 U.S. 886, 102 S.Ct. 3409, 73 L. Ed. 2d (1982). The *Noerr-Pennington* doctrine precludes liability for tort claims such as "common-law tortious interference with contractual relations" in addition to antitrust claims because "[t]here is simply no reason that a common- law tort doctrine can any more permissively abridge or chill the constitutional right of petition than can a statutory claim such as antitrust." *Video Int'l*, 858 F.2d at 1084. The doctrine thus bars not only the appellees' restraint of trade claims in this case, but also their claims for tortious interference and civil conspiracy.

¶33. In *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 861-62 (5th Cir. 2000), the Fifth Circuit stated the following:

> The Supreme Court has clearly stated that efforts to influence public officials will not subject individuals to liability, even when the sole purpose of the activity is to drive competitors out of business. *See Pennington*, 381 U.S. at 670, 85 S.Ct. 1585. The Court has allowed only one exception to the *Noerr-Pennington* doctrine-the "sham" exception. *See Omni Outdoor Advertising, Inc.* 499 U.S. at 380, 111 S.Ct. 1344.
>
> The "sham" exception involves attempts to influence public officials for the sole purpose of expense or delay. *See Omni Outdoor Advertising, Inc.*, 499 U.S. at 380, 111 S.Ct. 1344. The exception applies to defendants who use the process as an anticompetitive weapon, rather than those who genuinely seek to achieve an intended result. *See id.* at 381, 111 S.Ct. 1344. The evidence must show that a defendant's lobbying activities were "objectively baseless" for the "sham" exception to apply. *Professional Real Estate Investors v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60, 113 S.Ct. 1920, 123, L. Ed. 2d 611 (1993); *Brown & Root, Inc. v. Louisiana State AFL-CIO*, 10 F.3d 316, 324 (5th Cir. 1994). Lobbying activity is objectively baseless if a reasonable private citizen could not expect to secure favorable government action. *See Professional Real Estate Investors*, 508 U.S. at 60, 113 S.Ct. 1920 ("[t]he lawsuit must be objectively baseless in a sense that no reasonable litigant could realistically expect success on the merits").

¶34. The "sham" exception to the *Noerr-Pennington* doctrine does not apply in this case. The United States Supreme Court outlined the test for the "sham" exception in *Professional Real Estate Investors*, 508 U.S. at 60-61.

> We now outline a two-part definition of "sham" litigation. First, the lawsuit must be objectively baseless in a sense that no reasonable litigant could realistically expect success on the merits. If an

objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the "sham" exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under the second part of our definition of "sham" the court should focus on whether the baseless lawsuit conceals "an attempt to interfere *directly* with the business relationships of a competitor," through the "use [of] the governmental process-as opposed to the outcome of that process-as an anticompetitive weapon." This two-tiered process requires the plaintiff to disprove the challenged lawsuit's *legal* viability before the court will entertain evidence of the suit's *economic* liability.

(citations omitted & emphasis in original).

¶35. Thus, Pennebaker and MGM were required to show that the appellants' lobbying activities were objectively baseless because no reasonable person could have realistically expected the MGC to deny approval of the site. They were further required to show that the activities were an attempt to interfere directly with the appellees' business through the site approval process itself rather than the outcome of that process. In other words, they should have proved that the casinos were not actually interested in persuading the MGC to deny approval of the site, but only sought to impose additional "expense and delay" on the appellees through the site approval process itself. *Omni*, 499 U.S. at 380.

¶36. Pennebaker and MGM did not meet this burden. The Supreme Court held in *Professional Real Estate Investors* that a plaintiff, as a matter of law, cannot satisfy the first prong of the "sham" test-that the defendants' petitioning activities were objectively baseless-if those activities were, in fact, successful. 508 U.S. at 60 n.5. The appellants' activities were successful in this case because the MGC denied approval of the Big Black River site. Therefore, as a matter of law, plaintiffs could not prove that the opposition to the site was a mere sham. Thus, there is no need to consider the second prong of the "sham" test-that the appellants actually intended to hinder the plaintiffs through added expense and delay rather than to persuade the MGC to deny the proposed site. Even if that inquiry were necessary, the plaintiffs presented no evidence suggesting that the casinos' lobbying activities were motivated by anything other than a desire to see approval of the site denied.

¶37. "A conspiracy exception to *Noerr-Pennington* immunity has been explicitly rejected by the Supreme Court unless the conspiracy 'reaches beyond mere anticompetitive motivation.'" *Bayou Fleet*, 234 F.3d at 861 n.9 (quoting *Omni Outdoor Advertising, Inc.*, 499 U.S. at 383, 111 S.Ct. 1344). Since the "sham" exception does not apply to the facts of this case and since the Supreme Court has refused to recognize a conspiracy exception, Harrah's and Ameristar are immune from liability under the *Noerr-Pennington* doctrine. The doctrine should have been appropriately applied in this case. If it had been, the appellants would have been entitled to summary judgment. The trial court erred in denying the appellees' summary judgment motions.

¶38. Further, the trial court erred by erroneously instructing the jury that "the right to petition, as a matter of law, does not extend to acts that would merely undermine, circumvent, or avoid the effectiveness of an existing law or policy" and that the *Noerr-Pennington* doctrine did not apply if the appellants' petitioning activities were "an attempt by the defendants to avoid or undermine the effectiveness of an existing law or policy or to misapply the law and policy which requires gaming to be conducted honestly and competitively." There simply is no exception to the *Noerr-Pennington* doctrine regarding avoidance or

undermining the effectiveness of law or policy; nor is there an exception regarding misapplication of the law or policy. The jury instruction contains a misstatement of the law. This Court has held that the granting of an instruction which misstates the law is reversible error. *Downtown Grill, Inc. v. Connell*, 721 So. 2d 1113, 1120 (Miss. 1998) (citing *Tipps Tool Co. v. Holifield*, 218 Miss. 670, 67 So. 2d 609 (1953)). However, if the instructions given, when read as a whole, fairly enounce the law of the case, then this Court will not reverse a trial court's decision concerning jury instructions. *Delahoussaye v. Mary Mahoney's, Inc.*, 783 So. 2d 666, 669 (Miss. 2001). Since this instruction was the only *Noerr-Pennington* instruction given by the trial court, it cannot be said that the jury was adequately instructed in this case. The trial court, thus, committed reversible error.

¶39. Pennebaker and MGM contend that "[t]he United States Supreme Court has held that governmental interest in certain forms of antitrade regulation is justified, even if that regulation may have an incidental effect on speech and association." In support of this assertion, they rely on cases dealing with the regulation of picketing and boycotting, not the fundamental right to petition the government underlying the *Noerr-Pennington* doctrine. *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949); *Food Employees v. Logan Valley Plaza, Inc.*, 391 U.S. 308 (1968); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982); *FTC v. Supreme Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990). The single Supreme Court case cited by the plaintiffs that actually deals with the right to petition is *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972). In this case, however, the Court held only that the defendants' activities fell within the true "sham" exception to *Noerr-Pennington* immunity. The plaintiffs' cases cited in support of their proposition are not persuasive.

¶40. We find that the plaintiffs' claims are barred by the *Noerr-Pennington* doctrine. Therefore, we reverse and render a judgment in favor of Harrah's and Ameristar. Because of the disposition reached herein, it is unnecessary to address the remaining issues raised by the parties.

## CONCLUSION

¶41. We acknowledge that the "open-door policy" employed by the MGC should be reexamined. Ex parte communications with Commissioners and unrestrained efforts to influence the MGC do not inspire public confidence in the Mississippi gaming system and should be curtailed. We are aware of no other state agency that allows such unabashed, unstructured, and unregulated lobbyist-to-agency interaction. There is a need for regulation and reform in this area of petitioning activity. Nevertheless, until the legislature addresses this need, we must apply the law as it stands today. Harrah's and Ameristar are immune from liability under the *Noerr-Pennington* doctrine. For the foregoing reasons, we reverse the judgment of the Pike County Circuit Court and render a judgment in favor of the appellants.

¶42. **REVERSED AND RENDERED.**

**PITTMAN, C.J., BANKS AND McRAE, P.JJ., WALLER AND COBB, JJ., CONCUR. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ AND EASLEY, JJ. DIAZ, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, J.**

**SMITH, JUSTICE, DISSENTING:**

¶43. I disagree with the majority's conclusion that the ***Noerr-Pennington*** doctrine bars the claims raised by the plaintiffs below. The claims below and the verdict are clearly supported by the law.

¶44. The majority disregards plaintiffs' contention that "[t]he United States Supreme Court has held that governmental interest in certain forms of antitrade regulation is justified, even if that regulation may have an incidental effect on speech and association." The majority justifies its disregard by stating that the cases upon which plaintiffs rely deal with the regulation of picketing and boycotting, not the fundamental right to petition the government. First, this justification suggests that the right to petition the government is somehow more important than the other actions. This is surely an incorrect suggestion. Discussing the political boycott at issue in ***NAACP v. Claiborne Hardware Co.***, 458 U.S. 886, 913 (1982), the United States Supreme Court stated:

> This Court has recognized that expression on public issues "has always rested on the highest rung of the hierarchy of First Amendment values." *Carey v. Brown*, 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263. "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75, 85 S.Ct. 209, 215, 13 L.Ed.2d 125. There is a "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686.

In the next breath, the Court discusses ***Eastern R.R. Presidents Conference v. Noerr Motor Freight Inc.*** Nowhere does the Court distinguish between the act of boycotting (at issue in ***Claiborne***) and the act of lobbying (at issue in ***Noerr***). Clearly, the Supreme Court considers the actions of boycotting and lobbying to rest on the same rung of the ladder of First Amendment values.

¶45. Second, this justification also suggests that the minor difference of boycotting versus letter writing or lobbying merits different legal consideration. It is true that ***Noerr*** and its progeny stand for the proposition that "parties who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws even though their petitions are motivated by anticompetitive intent." ***Video Int'l Prod., Inc. v. Warner-Amex Cable Communications, Inc.***, 858 F.2d 1075, 1082 (5th Cir. 1988) (discussing the ***Noerr-Pennington*** doctrine). Notwithstanding the holding of ***Noerr***, ***Giboney v. Empire Storage & Ice Co.***, 336 U.S. 490, 495 (1949), clearly enunciates the fact that "states have constitutional power to prohibit competing dealers and their aiders and abettors from combining to restrain freedom of trade..."

¶46. Even a cursory reading of these cases clearly demonstrates that the rationalization for the different holdings lies not in the mode of action, as suggested by the Majority, but rather in the illegality of the action. In ***Noerr***, a group of long-distance trucking companies was suing several major railroads and others for violations of the Sherman Antitrust Act. 365 U.S. 127 (1961). This suit was based on publicity campaigns engaged in by the railroads aimed at creating disfavor among the public for the trucking industry and at encouraging passage of legislation that would hurt the trucking industry's ability to compete for long-haul business with the railroads. In ***Giboney***, the Court was faced with picketing by an ice peddlers union. 366 U.S. at 490. The union's goal was to induce all nonunion peddlers to join. In furtherance of this goal, the union set out to obtain agreements from all of the wholesale ice distributors in the area to not sell ice to nonunion peddlers. All distributors agreed with the exception of Empire Ice and Storage, and thus the picketing was aimed at this last holdout.

¶47. The actions in *Noerr* were in no way illegal, although the Court acknowledged that the action fell "far short of the ethical standards generally approved in this country." 365 U.S. at 141. In *Giboney*, the Court noted that refusal to sell to nonunion peddlers was illegal under Missouri law, and thus the picketing was aimed at compelling another entity to break the law. 366 U.S. at 492. As the Court stated in *Giboney*, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id*. at 502.

¶48. The majority erroneously disregarded the holdings of several cases following this principle enunciated in *Giboney* for the sole reason that the activities were different. As I have stated above, the difference behind the ultimate findings was based on the illegality of the action involved and had nothing to do with the mode of action at issue. Thus, it is important to look at the issue of legality in regard to the conduct of the defendants below, and beyond whether or not they were writing letters to the government before it can be determined whether the *Noerr-Pennington* doctrine bars the plaintiffs' suit.

¶49. In Miss. Code Ann. § 75-76-3 (3), the Legislature codified the public policy of Mississippi in regard to the Mississippi Gaming Control Act. Subsections (a) and (b) state:

> (a) Regulation of licensed gaming is important in order that licensed gaming is conducted *honestly and competitively*, that the rights of the creditors of licensees are protected and that gaming is free from criminal and *corruptive* elements.

> (b) Public confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments and the manufacture or distribution of gambling devices and equipment.

Miss. Code Ann. § 75-76-3 (2000). In a memorandum approving a gaming site proposed by Gold Strike Resort and Casino and Lone Star Pine Hills Corporation, the Mississippi Gaming Commission (the Commission) noted that this statutory language places "an affirmative duty on [it] to promote competition in [the gaming industry."[1] The language of the statute is clear in that it does place such a duty upon the Commission. At the same time, it places a duty upon those participating in gaming operations in the State to conform their behavior to meet the requirements of conducting such business "honestly and competitively," as well as keeping it free from "criminal and *corruptive* elements."

¶50. It is clear that in *Giboney* the Supreme Court intended to exclude from First Amendment protection such conduct, normally shrouded in such a cloak of protection, that had an illegal end. 336 U.S. at 502 ("[P]lacards used as an essential and inseparable part of a grave offense against an important public law cannot immunize that unlawful conduct from state control."). Further, in *Giboney* the Supreme Court made it clear that it would not pass judgment on the worthiness of the state law at issue when it found:

> We are without constitutional authority to modify or upset Missouri's determination that it is in the public interest to make combinations of workers subject to laws designed to keep the channels of trade wholly free and open. To exalt all labor union conduct in restraint of trade above all state control would greatly reduce the traditional powers of states over their domestic economy and might conceivably make it impossible for them to enforce their antitrade laws.

*Id*. at 497. More recently, the Supreme Court reiterated its words in *Giboney* by stating, "[t]he presence

of protected activity...does not end the relevant constitutional inquiry. Governmental regulation that has an incidental effect on First Amendment freedoms may be justified in certain narrowly defined instances." *NAACP v. Claiborne Hardware Co.*, 458 U.S. at 911. *Claiborne* cites *United States v. O'Brien* for that proposition and further quotes it as saying:

> To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

458 U.S. at 912 (citing *O'Brien*, 391 U.S. 367 (1968)). *Claiborne* further cites to *Giboney* for the proposition that "[t]his Court has recognized the strong governmental interest in certain forms of economic regulation, even though such regulation may have an incidental effect on rights of speech and association." *Id*. (citations omitted).

¶51. The Mississippi Legislature has spoken clearly that § 75-76-3 is the public policy of the State. It has said that honesty and competition in the gaming industry are required. It has found that crime and corruption must not be a part of this industry. While the integrity and character of the three commissioners involved in this case is certainly beyond reproach and of no concern to this Justice, nevertheless, what is of concern is the atmosphere created here in which numerous attempts occurred involving people acting on behalf of existing Vicksburg casinos in attempting to influence the commissioners' ultimate decision. Such behavior is not proper nor should it be permitted by the Commission. The Commission has previously stated, "This Commission is not charged to protect existing licensees from additional competition, and we do not intend to allow perpetuation of oligopoly through challenges to sites of competitors." *Pine Hills Gold Strike,* at 26. Commissioners serve in capacities similar to judges deciding significant issues involving the gaming industry. No one should be allowed to discuss pending gaming cases, or issues, with the commissioners, especially ex parte. In my view Miss. Code Ann. § 75-76-3 requires honesty and competition in the gaming industry. However, at a minimum, the Commission regulations and policy should prevent circumstances from occurring like the events in the case below. Absence of a strong enforcement of our gaming statutes, regulations and public policy will necessarily result in gaming problems similar to those our sister states have experienced. The events which occurred in the case at bar give an appearance of impropriety and tend to erode public trust and confidence in the Commission as well as the gaming industry. Needless to say, considering all that occurred in the case sub judice, it is little wonder that the jury found that the defendants had acted in a manner inconsistent with these requirements.

¶52. This Court "will not reverse a jury verdict unless it is against the overwhelming weight of evidence and credible testimony." *Wallace v. Thornton*, 672 So. 2d 724, 727 (Miss. 1996) (quoting *Gifford v. Four-County Elec. Power Ass'n.*, 615 So. 2d 1166, 1171 (Miss. 1992)). This standard is not met in the case below. The defendants engaged in a campaign to push the Commission to ignore its affirmative duty. They offered money to historic preservation groups for land purchases to engage those groups in aiding their lobbying efforts. They compelled employees and other groups to write letters to the Commission and newspapers. Further, they had direct conversations with Commission members to encourage them to deny the request to build a casino on the Big Black River. Further, it is clear from the evidence below that the

defendant casinos colluded in presenting an "independent" study of the impact of such a casino on Vicksburg and the casinos currently located there; however, the defendant casinos clearly had a part in preparing the study presented to the Commission.

¶53. The majority states that the policy of the Commission should be reexamined, and that ex parte communications with Commissioners and unrestrained efforts to influence the Commission, as occurred in the case below, should be curtailed. Considering this language and the majority's ultimate holding, it appears that the majority does not find the current law broad enough to cover the actions taken by the Vicksburg Casinos. While I believe that the current law is broad enough to cover the conduct below, I still believe that strong measures must be taken by the Commission to prevent such conduct in the future.

¶54. The Commission must not allow ex parte communications with those seeking a gaming license. Also, the Commission should specifically prohibit the type of conduct engaged in by the Vicksburg casinos; and furthermore, such conduct should call for a reprimand or disciplinary procedures by the Commission. The gaming industry in sister states has received its share of press for suspected involvement in unethical or criminal activities, and the conduct which has occurred here does not help instill any type of public trust that such activity will not occur in Mississippi. The Commission stands in a unique position as regulator of the gaming industry in this State. In this position, if it ignores its mandate of regulating the industry honestly it can cause great harm to this State and to the perception of State government in general.

¶55. I disagree with the majority's total disregard of the case law following *Giboney*, and their finding that the *Noerr-Pennington* doctrine bars the suit below. The defendants actions went beyond merely violating ethical standards, as was the case in *Noerr*, and moved into violating public law. I would affirm the judgment based on the jury verdict. Thus, I respectfully dissent.

**DIAZ AND EASLEY, JJ., JOIN THIS OPINION.**

**DIAZ, JUSTICE, DISSENTING:**

¶56. The fair and just regulation of Gaming in this State is of the utmost importance. The Legislature declared the public policy behind the Gaming Control Act requires that licensed gaming be conducted honestly and competitively and free from criminal and corruptive elements. Miss. Code Ann. § 75-76-3(3) (2000). The conduct of Harrah's and Ameristar smacks of conspiracy and corruption. Therefore, I respectfully dissent.

¶57. The majority applies the *Noerr-Pennington* doctrine to this case and finds the casinos' conduct in "petitioning" the government to be immune from attack. The purpose of the *Noerr-Pennington* doctrine is, of course, the protection of our First Amendment right to free speech. However, that right is not unlimited.

¶58. The majority dismisses *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 69 S.Ct. 684, 93 L. Ed. 834 (1949) and its progeny because those cases involve picketing and boycott ing instead of direct petitioning of the government.

¶59. I find *Giboney* and the cases that follow it to be very relevant to this case. *Giboney* held that governmental interest in certain forms of anti-trade regulation is justified, even if that regulation may have an incidental effect on speech and association. *Id*. at 495. That holding has been reaffirmed in *NAACP v. Claiborne Hardware Co*., 458 U.S. 886, 912, 102 S.Ct. 3409, 3425, 73 L. Ed. 2d 1215 (1982) (decided well after the *Noerr-Pennington* doctrine was established).

¶60. As admitted by the majority in its conclusion,

> We acknowledge that the "open-door policy" employed by the MGC should be reexamined. Ex parte communications with Commissioners and unrestrained efforts to influence the MGC do not inspire public confidence in the Mississippi gaming system and should be curtailed. We are aware of no other state agency that allows such unabashed, unstructured, and unregulated lobbyist-to-agency interaction. . . .

The majority goes on to state that it is for the Legislature to resolve this problem and that the law must be applied as it stands today.

¶61. I disagree. This Court has a duty to see that justice is served. Justice is not served by allowing these corporations to launch a full-scale conspiracy to influence the decision of the Mississippi Gaming Commission. As stated in *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 514, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972):

> "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced or carried out by means of language, either spoken, written or printed. . . . Such an expansive interpretation of the constitutional guarantees of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society."

(quoting *Giboney*, 336 U.S. at 502).

¶62. We can and should affirm the judgment of the Pike County Circuit Court that Harrah's and Ameristar pursued a course of conduct designed to produce an unfair and unjust result.

    **SMITH, J., JOINS THIS OPINION.**

1. The Commission's approval of the site was set aside by this Court in *Mississippi Casino Operators Ass'n v. Mississippi Gaming Comm'n*, 654 So. 2d 892 (Miss. 1995). However, in this opinion the Court did not dispute the language regarding § 75-76-3.